# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ASHLEY NICOLE NORMAN, Personal Representative of the Estate of Rebecca Lee Dewitt Gould, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. CIV-11-290-M ) |
| STEVE RANDOLPH, et al., | ) ) |
| Defendants. | ) ) |

## ORDER

This case is scheduled for trial on the Court's March 2014 trial docket.

Before the Court is defendant Sam Saeger's ("Saeger") Motion for Summary Judgment, filed January 2, 2014. On January 23, 2014, plaintiff filed her response, and on January 30, 2014, Saeger filed his reply. Also before the Court is defendant Steve Randolph's ("Sheriff Randolph") Motion for Summary Judgment, filed January 2, 2014. On January 23, 2014, plaintiff filed her response, and on January 30, 2014, Sheriff Randolph filed his reply. Based upon the parties' submissions, the Court makes its determination.

I.  Introduction

Sheriff Randolph was at all times relevant to this action the Sheriff of Major County. Saeger was the Jail Administrator for the Major County Jail ("MCJ") at all times relevant to this action. The MCJ was authorized to hold up to nineteen inmates. If space was available, female inmates were housed in an area of the jail that could be separated from the general population area. If there was not sufficient space to house female inmates in the separate area due to too many male occupants, the Major County Sheriff's Office had an agreement to transfer the female(s) to the

Alfalfa County Jail ("ACJ") for temporary housing until sufficient space and the particular jail cell became available.[1]

On March 5, 2009, Rebecca Gould ("Gould") was arrested and booked into the MCJ on a felony criminal charge out of Major County District Court.[2] At the time of Gould's book-in, staff performed a medical review/evaluation during which it was noted that Gould had never been treated for any mental illness. The medical questionnaire did note a number of other medical issues of Gould. The medical questionnaire, itself, does not provide any information regarding whether any initial suicide evaluation, history or risk assessment was performed on Gould.

Gould spent one night in the MCJ before being transferred on March 6, 2009 to the ACJ for housing due to limited housing space in the MCJ. There were no behavior issues during this time. When Gould was booked into the ACJ on March 6, 2009, ACJ staff also performed a medical review/evaluation of Gould. During the evaluation, Gould denied being suicidal and denied having received any psychiatric care.

On March 12, 2009, Gould was returned to the MCJ where she was placed in a cell with one other female cellmate. Saeger was not advised of any, and there were no known, incidences or behavior issues during the time Gould spent at the ACJ. It was evident from her attitude and interactions with MCJ staff that Gould was not pleased to be in the MCJ, but she had no disciplinary

---

[1] While in another county jail on such a transfer, the MCJ remains responsible for the providing and the costs of medical care for the inmate. If there was a medical or behavior issue with an inmate, the ACJ staff would notify the MCJ Jail Administrator or jail staff of the issue so that they would be aware of it and take any steps to resolve the issues or problems.

[2] On February 25, 2009, Gould's husband, Thomas Gould, was arrested on criminal charges as a result of a warrant from a Major County District Court case. Thomas Gould was in the MCJ during the entirety of Gould's incarceration.

incidents, extraordinary behavior issues, unusual medical issues, threats of suicide, or known/obvious mental health issues at the MCJ between March 12 and the afternoon of March 14, 2009.

During the early afternoon of Saturday, March 14, 2009, Gould's cellmate bonded out and was released from the MCJ, leaving Gould in a cell by herself. The cell was isolated from all other cells and was not visible to any other inmate, although Gould could be heard in the other jail cells if she were to yell or scream. Sometime later that afternoon, Gould began hollering and yelling that she had made bond, was supposed to have been released, and was complaining that the jail was continuing to illegally hold her. However, at no time did Gould make bond on the pending criminal charge. Gould continued to intermittently scream and holler very loudly and repeatedly about being released and tried to call out to her husband, who was housed in a different part of the jail but not visible to her and who would also call out to her. The loud hollering would continue for a time and then cease for an extended time with this pattern continuing through the afternoon. Eventually, Saeger approached Gould, told her that she had not been bonded out, and told her to quit screaming and yelling and to lay down and be quiet.

When dinner was served, Gould refused to eat. She then started yelling and screaming again to let her out. Saeger then tried, through a raised voice, to command her to calm down and even threatened to pull her privileges, such as television viewing, but was not successful. When Saeger could not get her to calm down, he states that he determined that it probably was in her best interests to have her evaluated at the hospital and possibly given some medication to calm her down. Saeger states that at no time prior to that point had Gould made any comments or engaged in actions which

3

caused him to believe she was suicidal, nor did her conduct indicate to him any suicidal tendencies or behaviors or the necessity for any immediate mental health care treatment.

Saeger contacted Sheriff Randolph to advise him of the situation and his belief that Gould might need to be taken to the local hospital for evaluation. Sheriff Randolph agreed, and between 8:00 p.m. and 9:00 p.m. Gould was placed in MCJ's holding cell where she could be more closely watched until she was transported by a deputy to the Fairview Regional Medical Center ("FRMC") at about 10:00 p.m. When Gould arrived at the FRMC, Dr. Solomon Ali, M.D., Nurse Shelia Beckner, R.N., and hospital staff were advised that Gould was brought to the hospital for evaluation because she had been greatly agitated and had exhibited unusual and erratic behavior at the jail. Approximately 30 minutes after she was brought to the hospital, Dr. Ali made his initial visit with Gould and found her to be calm and coherent with appropriate answers to his questions and with no signs of undue stress or any physical injury. Because Gould told Dr. Ali that officers at the jail were prodding her and her husband with a cattle prod, but she did not have any physical injuries consistent with those statements, Dr. Ali determined that her behavior was indicative of paranoid hallucinations and that it was appropriate and even necessary to assess Gould for suicidal and/or homicidal thoughts/ideas. Dr. Ali determined that Gould was having periodic delusions but did not believe that she was a suicidal threat or a threat to other persons.

Dr. Ali's staff conferred with staff at the Northwest Center for Behavioral Health ("NCBH"), a mental health facility with the Oklahoma State Department of Mental Health and Substance Abuse Services ("ODMHSAS"), as well as a staff member from the Fairview branch office of the ODMHSAS. Due to the pending charges against Gould, an individual with NCBH advised that unless the charges were dropped, there was really nothing she could do for Gould at this point.

4

Additionally, a counselor with the ODMHSAS advised that if Gould was determined not to be physically threatening to herself or threatening other persons with physical harm, she was not a candidate for involuntary admission to the mental health center.

Dr. Ali decided to treat Gould's agitation through prescription medication, which he believed would keep her calm through the rest of the weekend, and recommended that she be seen by a local mental health professional two days later, on the following Monday. He provided Gould with a dosage of Haldol to help with her agitation/psychosis and with a dosage of Remeron to help with her insomnia and then discharged her back into police custody with prescriptions for once-a-day dosages of Geodon and Remeron sufficient to cover Gould until she could be assessed by mental health professionals on the following Monday.

Gould was returned to the MCJ after midnight on the morning of March 15, 2009, was placed in the same cell, and was visually checked hourly by the on-duty jailer, Tom Wallace. Gould's cell could also be monitored through the MCJ's video/audio monitoring system. When Saeger returned to work later that day to begin his shift at 12:30 p.m., he was advised by Mr. Wallace that Gould was back in the jail, that she was quiet, that there had been no issues with her behavior, and that she was not under any suicide watch. Throughout the day, Saeger conducted walkthroughs of the jail and personally observed Gould. Saeger states that he always found her to be awake, pleasant, and quiet. David Kent Mitchell, a DOC trustee at the MCJ, has testified, however, that throughout the day, Gould was crying off and on. About 6:00 p.m., Saeger provided Gould with her medications, and Saeger states that he found her calm and alert. Saeger continued to make the hourly inmate checks, including a check at 8:06 p.m.

5

Shortly thereafter, at approximately 8:30 p.m., it was noticed on the jail video monitor that a white sheet was hanging from the cell bars of Gould's cell. Saeger states that he was not initially alarmed because it was not uncommon for females to place a sheet on the bars to ensure extra privacy while showering in the back of the cell. However, when, within a couple of minutes, Saeger determined that he did not hear the female cell's shower and that the angle of the sheet as viewed on the monitor did not seem right, he immediately went upstairs to the jail to check and noticed Gould hanging from the cell bars.

Saeger ran back downstairs to request help, told one of the officers to call an ambulance, and retrieved the cell keys. Saeger and other officers ran upstairs, entered the cell, cut Gould down, and attempted emergency medical responses until the ambulance arrived. Gould was transferred to the Fairview hospital, where she was pronounced dead.

The MCJ has written policies and procedures and operational practices to address medical care and suicide intervention/prevention for inmates in the MCJ. Specifically, MCJ Policy 6.08 (Psychological/Psychiatric) provides, in pertinent part:

> Deputies shall routinely observe all inmates, especially those newly admitted or just sentenced, for abnormal behavior indicative of potential suicide, such as:
> a. Depression
> b. Sleeping difficulties
> c. Withdrawal from others
> d. Apathy, despondency
> e. Slow walking
> f. Slumped sitting
> g. Frequent crying
> h. Easily fatigues
> i. Weight loss
> j. Loss of appetite
> k. Talks of suicide
> l. Sudden mood changes
> m. Agitation

> n. Overt psychosis
>
> Deputies shall inform the Shift Supervisor and his/her relief Deputy at the change of shift of any such observations. If it is decided that an inmate may be suicidal, the inmate shall be placed in an area where he/she can be constantly observed and communication encouraged.

MCJ Policy 6.08, attached as Exhibit 31 to Defendant Sam Saeger's Motion for Summary Judgment and Brief in Support.

In this case, plaintiff alleges claims under 42 U.S.C. § 1983 for alleged violations by Saeger and Sheriff Randolph of Gould's constitutional rights based on alleged deliberate indifference to her serious medical needs.[3] Defendants Saeger and Sheriff Randolph now move the Court for summary judgment as to plaintiff's claims.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party is entitled to summary judgment where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. When applying this standard, [the Court] examines the record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 156 F.3d 1068, 1071-72 (10th Cir. 1998) (internal citations and quotations omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Furthermore, the non-movant has a burden of doing more than simply showing there is some metaphysical doubt as to the material facts.

---

[3]Plaintiff is not making any allegations that the MCJ staff delayed or did not promptly respond to Gould's situation as soon as they were aware that she was attempting to commit suicide.

Rather, the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (internal citations and quotations omitted).

III.   Discussion

    A.   Standing

Initially, this case was brought by Thomas Gould, as the surviving spouse of Gould. In their motions for summary judgment, Saeger and Sheriff Randolph assert that this action should be dismissed with prejudice because Mr. Gould lacks standing to bring these § 1983 claims. Defendants are correct that these § 1983 claims cannot be brought by the surviving spouse of the deceased but must be brought by the estate of the deceased victim. On February 10, 2014, the Court granted plaintiff's motion to amend and/or substitute party and substituted Ashley Nicole Norman, the personal representative of the estate of Gould, as the plaintiff in this matter. Accordingly, the Court finds that Saeger and Sheriff Randolph's arguments regarding standing are now moot.

    B.   Deliberate indifference claims

"[C]laims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand Cnty., Utah*, 119 F.3d 862, 866 (10th Cir. 1997). Thus, plaintiff's claims must be judged against the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *See id.*

at 869.⁴ Defendants, therefore, must be found to have been "deliberately indifferent" to a substantial risk of suicide.

In order to state a claim, a plaintiff must satisfy both objective and subjective elements. The objective element is met if the medical need is sufficiently serious. *See Garrett v. Stratman*, 254 F.3d 946, 949 (10th Cir. 2001). Additionally, where the allegations rest on an alleged delay in the provision of medical treatment, there is no constitutional violation unless the plaintiff can show the delay was due to deliberate indifference and that she suffered "substantial harm" as a result. *See Sealock v. Colo.*, 218 F.3d 1205, 1210 (10th Cir. 2000). In their motions, both Saeger and Sheriff Randolph concede that suicide is a sufficiently serious medical need and that it constitutes substantial harm under the objective element of the deliberate indifference test.

The subjective element of the deliberate indifference test requires a showing of a "sufficiently culpable state of mind" amounting to a "deliberate indifference" to a substantial risk of serious harm to an inmate. *See Farmer v. Brennan*, 511 U.S. 831, 834 (1994). A defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Negligence, or even gross negligence, is not sufficient to support a claim of deliberate indifference. *See Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1495 (10th Cir. 1990). The Tenth Circuit has held:

> to establish deliberate indifference to an inmate's safety the plaintiff must show (1) actual knowledge of the specific risk of harm [to the detainee] . . . or that the risk was so substantial or pervasive that knowledge can be inferred; (2) fail[ure] to take reasonable measures to avert the harm; and (3) that failure to take such measures in light

---

⁴Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment. *See Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992).

> of [the] knowledge, actual or inferred, justifies liability for the
> attendant consequences of [the] conduct, even though unintended.

*Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (internal quotations and citations omitted).

### 1. Saeger – individual capacity

The Court has carefully reviewed the parties' briefs and evidentiary submissions. Viewing the evidence in the light most favorable to plaintiff and viewing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff has not submitted sufficient evidence to create any genuine dispute as to whether Saeger was deliberately indifferent to a substantial risk of suicide. Specifically, the Court finds that plaintiff has not shown that Saeger disregarded a known or obvious risk that Gould would commit suicide. While Gould exhibited a number of the abnormal behaviors indicative of potential suicide defined in MCJ Policy 6.08 on the afternoon and evening of March 14, 2009, Saeger did not ignore this behavior, but instead contacted Sheriff Randolph and advised Sheriff Randolph of his belief that Gould might need to be taken to the local hospital for evaluation. Further, Saeger actually did have Gould taken to the local hospital for evaluation. Gould was seen by a doctor. The doctor found Gould was not suicidal and was not in imminent danger and prescribed Gould some additional medications, and Gould was returned to the MCJ. On March 15, 2009, viewing the evidence in the light most favorable to plaintiff, Gould would cry off and on, loudly at times, that day, but did not exhibit any of the other behavior she had engaged in the day before. Further, throughout the day, Saeger conducted walkthroughs of the jail and observed Gould, as well as monitored Gould through the MCJ's audio/video monitoring equipment. Based upon these facts, taken in the light most favorable to plaintiff, the Court finds Saeger did not know, and

no inference should have been drawn by Saeger, that Gould was suicidal or that she presented any increased risk of suicide.

Accordingly, the Court finds that Saeger, in his individual capacity, should be granted summary judgment.

### 2. Sheriff Randolph – individual capacity

"Section 1983 claims against public officials must demonstrate some form of personal involvement on the part of the individual defendants." *Bruner v. Baker*, 506 F.3d 1021, 1026 (10th Cir. 2007). Having carefully reviewed the parties' submissions, and viewing the evidence in the light most favorable to plaintiff and viewing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff has not set forth sufficient evidence of Sheriff Randolph's personal involvement. Sheriff Randolph's direct participation in the subject incident is extremely limited. Saeger contacted Sheriff Randolph to advise him of Gould's behavior and his belief that she might need to be taken to the local hospital for evaluation, and Sheriff Randolph agreed. Further, Sheriff Randolph was in the jail for a training exercise at the time of Gould's suicide. Based upon this extremely limited involvement, the Court finds that plaintiff cannot show that Sheriff Randolph acted with deliberate indifference to a substantial risk that Gould would commit suicide.

The Tenth Circuit, however, has also held, that even without personal involvement in an alleged constitutional violation, a supervisor may be held liable in his individual capacity under § 1983 if "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). Having reviewed the parties' submissions, and

11

viewing the evidence and all reasonable inferences in plaintiff's favor, and in light of the Court's previous finding the Saeger was not deliberately indifferent to a substantial risk that Gould would commit suicide, the Court finds that there is no evidence that Sheriff Randolph promulgated, created, implemented or possessed responsibility for the continued operation of a policy, practice or custom which caused any violation of Gould's constitutional rights or that he acted with the requisite state of mind of "deliberate indifference."

Accordingly, the Court finds that Sheriff Randolph, in his individual capacity, is entitled to summary judgment.

### 3. Official capacity claims

Because the Court has found there were no violations by Saeger and Sheriff Randolph of Gould's constitutional rights based on alleged deliberate indifference to her serious medical needs, the Court finds that plaintiff's claims against Saeger and Sheriff Randolph in their official capacities fail as a matter of law. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 690 n. 55 (1978). A governmental entity can not be liable when there is no underlying constitutional violation. *See Camuglia v. The City of Albuquerque*, 448 F.3d 1214, 1223 (10th Cir. 2006); *Apodaca v. Rio Arriba Cnty. Sheriff's Dep't*, 905 F.2d 1445, 1447 (10th Cir. 1990).

Accordingly, the Court finds that Saeger and Sheriff Randolph, in their official capacities, are entitled to summary judgment.

IV.     Conclusion

For the reasons set forth above, the Court GRANTS Saeger's Motion for Summary Judgment [docket no. 55] and Sheriff Randolph's Motion for Summary Judgment [docket no. 56].

**IT IS SO ORDERED this 18th day of February, 2014.**

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE